UNITED STATES of America,
Plaintiff,

v.

MARSHALL & ILSLEY BANK STOCK
CORPORATION, Marshall & Ilsley
Bank, Northern Bank and the Bank of
Commerce, Defendants.

No. 61–C–54.

United States District Court
E. D. Wisconsin.

June 15, 1966.

Maxwell Herriott, Quarles, Herriott &
Clemons, Milwaukee, Wis., for defend-
ants.

Herbert G. Schoepke, Dept. of Justice,
Washington, D. C., James B. Brennan,
U. S. Atty., Milwaukee, Wis., for plain-
tiff, United States.

## OPINION

TEHAN, Chief Judge.

On March 2, 1961, the United States of
America filed a complaint in this court
against Bank Stock Corporation of Mil-
waukee, now Marshall & Ilsley Bank
Stock Corporation, Marshall & Ilsley
Bank, Northern Bank and The Bank of
Commerce, all Wisconsin corporations, al-
leging that the cumulative effect of acqui-
sitions by Bank Stock of more than 80%
of the outstanding voting stock of Mar-
shall & Ilsley Bank and Northern in De-
cember of 1959 and of 80% or more of the
outstanding common stock of Commerce
in January of 1961 may be substantially
to lessen competition or to tend to create
a monopoly in commercial banking in the
City and County of Milwaukee in viola-
tion of § 7 of the Clayton Act (Title 15
U.S.C. § 18), and asking that Bank Stock
be adjudged to have violated that section,
be required to divest itself of the stock
unlawfully acquired, and be enjoined
from acquiring stock in any other com-
mercial bank in Milwaukee County with-
out court approval.[1] Preceding this ac-
tion and the acquisitions complained of,
the Board of Governors of the Federal
Reserve System, acting pursuant to the
Bank Holding Company Act of 1956, had
approved the applications of Bank Stock
to become a bank holding company and to
acquire the stock of Marshall & Ilsley
Bank, Northern and Commerce.

The defendants' answer to the com-
plaint was filed on May 22, 1961; trial

1. This prior approval, if required, would
be the second approval since, as will later
appear, approval of any substantial ac-
quisition must be obtained from the
Board of Governors of the Federal Re-
serve System.

was held in June, July and November, 1963; briefs were filed, the last being briefs requested by the court and filed in May of 1966, oral argument was heard, and the court is prepared to render its decision.

■ Reflecting as it does disagreement between two executive agencies, both charged with the duty of enforcing § 7, as to the advisability and propriety of acquisitions of bank stock by a bank holding company, this case arises in a maze of legislative and judicial pronouncements relative to jurisdiction. Our examination of those authorities convinces us that this court has no jurisdiction under § 15 of the Clayton Act (Title 15 U.S.C. § 25), the jurisdictional basis relied upon by the p'aintiff, to enjoin or undo stock acquisitions by bank holding companies which must be or have been approved by the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 and that the jurisdiction of district courts under § 15 of the Clayton Act to enforce § 7 of that act against such bank holding company acquisitions on complaint of the United States has been "plainly supplanted" [2] by the Bank Holding Company Act of 1956. This conclusion is not to be interpreted as a ruling that § 7 is inapplicable to bank holding companies. Rather, it means that the Board of Governors of the Federal Reserve System alone can apply and enforce that section against bank holding company acquisitions which it is asked to approve under the Bank Holding Company Act of 1956, and must do so in ruling on applications under that Act. A discussion of the authorities which compel this conclusion follows.

The Clayton Act, §§ 7, 11 and 15 of which here concern us, became law in 1914. Paragraph 2 of § 7 thereof provided:

"No corporation shall acquire, directly or indirectly, the whole or any part of the stock or other share capital of two or more corporations engaged in commerce where the effect of such acquisition, or the use of such stock by the voting or granting of proxies or otherwise, may be to substantially lessen competition between such corporations, or any of them, whose stock or other share capital is so acquired, or to restrain such commerce in any section or community, or tend to create a monopoly of any line of commerce."

and remained unchanged until 1950 when it was amended to read as follows:

"No corporation shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of one or more corporations engaged in commerce, where in any line of commerce in any section of the country, the effect of such acquisition, of such stocks or assets, or of the use of such stock by the voting or granting of proxies or otherwise, may be substantially to lessen competition, or to tend to create a monopoly."

This amendment, while substantial, is not relevant to the jurisdictional problem here presented.

Unquestionably, banks and bank holding companies fall within the purview of § 7 as originally enacted and as amended. Transamerica Corp. v. Board of Governors (C.A. 3, 1953) 206 F.2d 163, United States v. Philadelphia National Bank, supra. The authorities do not so clearly reveal, however, the manner in which § 7 must be enforced.

The Clayton Act, as originally passed, provided a system of dual enforcement of § 7 as to banks, banking associations and trust companies. § 11 thereof (Title 15 U.S.C. § 21) vested authority to enforce compliance with § 7 in the Federal Reserve Board where applicable to banks, banking associations and trust companies, directed the Board to commence proceedings pursuant to that authority if it had reason to believe § 7 was violated,

---

2. United States v. Philadelphia National Bank (1963) 374 U.S. 321 at 344, Footnote 22, 83 S.Ct. 1715, 10 L.Ed.2d 915.

and set forth the procedure to be followed. § 15 conferred jurisdiction to prevent and restrain violations of § 7 on district courts of the United States and imposed a duty on United States district attorneys, under the direction of the Attorney General, to institute proceedings to prevent and restrain such violations. Both sections were thereafter amended in particulars not here material.

On this thus far fairly uncomplicated legislative scene appeared the Bank Holding Company Act of 1956 (Title 12 U.S.C. § 1841–§ 1848) which became law on May 9, 1956. This Act which at various stages in its legislative history was referred to as a bill "To define bank holding companies, *control their future expansion,* and require divestment of their nonbanking interests" (emphasis ours) prohibited in relevant part formation of bank holding companies, as defined in the Act, and acquisitions by bank holding companies of a certain percentage of the voting shares of any bank without prior approval of the Board of Governors of the Federal Reserve System.[3] The manner in which approval is to be sought is set forth in Paragraph (b) of § 3 of the Act, (Title 12 U.S.C. § 1842(b)) as follows:

"(b) Upon receiving from a company any application for approval under this section, the Board shall give notice to the Comptroller of the Currency, if the applicant company or any bank the voting shares or assets of which are sought to be acquired is a national banking association or a District bank, or to the appropriate supervisory authority of the interested State, if the applicant company or any bank the voting shares or assets of which are sought to be acquired is a State bank, and shall allow thirty days within which the views and recommendations of the Comptroller of the Currency or the State supervisory authority, as the case may be, may be submitted. If the Comptroller of the Currency or the State supervisory authority so notified by the Board disapproves the application in writing within said thirty days, the Board shall forthwith give written notice of that fact to the applicant. Within three days after giving such notice to the applicant, the Board shall notify in writing the applicant and the disapproving authority of the date for commencement of a hearing by it on such application. Any such hearing shall be commenced not less than ten nor more than thirty days after the Board has given written notice to the applicant of the action of the disapproving authority. The length of any such hearing shall be determined by the Board, but it shall afford all interested parties a reasonable opportunity to testify at such hearing. At the conclusion thereof, the Board shall by order grant or deny the application on the basis of the record made at such hearing."[4]

The factors to be considered by the Board in granting or denying approval are set forth in Paragraph (c) of § 3 as follows: (Title 12 U.S.C. § 1842(c))

"(c) In determining whether or not to approve any acquisition or merger or consolidation under this section, the Board shall take into consideration the following factors: (1) the financial history and condition of the company or companies and the banks concerned; (2) their prospects; (3) the character of their management; (4) the convenience, needs, and welfare of the communities and the area concerned; and (5) whether or not the effect of such acquisition or merger or consolidation would be to expand the size or extent of the bank holding company system involved beyond limits consistent with adequate and sound banking, the public

---

3. This provision is unlike the Bank Merger Act of 1960 considered by the United States Supreme Court in *Philadelphia Bank* which assigned roles in bank merger applications, depending on the nature of the institution, to either the Board, the Comptroller of the Currency, or the Federal Deposit Insurance Corporation, the latter two of which have no enforcement power whatsoever under the Clayton Act.

4. In contrast, the Bank Merger Act of 1960 involved in *Philadelphia Bank* provided for no hearing whatsoever.

interest, and the preservation of competition in the field of banking."[5]

Section 9 of the Bank Holding Company Act of 1956 as amended, provides for judicial review as follows: (Title 12 U.S.C. § 1848)

"Any party aggrieved by an order of the Board under this chapter may obtain a review of such order in the United States Court of Appeals within any circuit wherein such party has its principal place of business, or in the Court of Appeals in the District of Columbia, by filing in the court, within sixty days after the entry of the Board's order, a petition praying that the order of the Board be set aside. A copy of such petition shall be forthwith transmitted to the Board by the clerk of the court, and thereupon the Board shall file in the court the record made before the Board, as provided in section 2112 of Title 28. Upon the filing of such petition the court shall have jurisdiction to affirm, set aside, or modify the order of the Board and to require the Board to take such action with regard to the matter under review as the court deems proper. The findings of the Board as to the facts, if supported by substantial evidence, shall be conclusive."[6]

5. These tests are not unlike those set forth in the Bank Merger Act involved in *Philadelphia Bank* which provided: (Title 12 U.S.C. § 1828(c))

"* * * In granting or withholding consent under this subsection, the Comptroller, the Board, or the Corporation, as the case may be, shall consider the financial history and condition of each of the banks involved, the adequacy of its capital structure, its future earnings prospects, the general character of its management, the convenience and needs of the community to be served, and whether or not its corporate powers are consistent with the purposes of this chapter. In the case of a merger, consolidation, acquisition of assets, or assumption of liabilities, the appropriate agency shall also take into consideration the effect of the transaction on competition (including any tendency toward monopoly), and shall not approve the transaction unless, after considering all of such factors, it finds the transaction to be in the public interest. * * *"

Although counsel for the plaintiff here has argued that the factors set forth in § 3 differ from the considerations under § 7 of the Clayton Act, the Attorney General himself, in commenting prior to recent amendment of the Bank Merger Act on that Act's similar factors, stated in a letter of September 24, 1965, printed in the 1966 U.S.Code Congressional and Administrative News at Page 340:

"While there are those in the banking industry and, indeed, in Government who differ with me, I strongly believe that objective analysis will disclose that in actual practice the differences in the standards applied by the banking agencies and by the courts, if any, have been overstated. In fact, the Supreme Court in the leading case has made it clear that all or most of the factors specified in the Bank Merger Act are relevant to a determination under section 7 of the Clayton Act or section 1 of the Sherman Act. * * *" (Page 341)

and in a letter dated January 5, 1966 printed at Page 346:

"* * * I should like to repeat here my strong belief that the differences, if any, in the standards applied to bank mergers by the courts and the standards applied by the agencies have been overstated. * * *" (Page 347)

6. The Bank Merger Act of 1960 contained no provision whatsoever for judicial review, a fact which, together with its lack of provision for hearing was considered significant by the Supreme Court in *Philadelphia Bank* (See Page 351 of that opinion in 374 U.S., page 1735 of 83 S.Ct.). When that Act was recently amended, provision for review similar to the Bank Holding Company provision was proposed. With respect to that provision, the Attorney General stated in the letter of September 24, 1965, referred to previously: (Page 342, 1966 U.S.Code Congressional and Administrative News)

"I am opposed to particular procedures set forth in H.R. 11011. The bill provides for review in a court of appeals on the basis of a 'record' upon which the order complained of was entered, and further provides that on review the findings of the agency as to the facts, if supported by substantial evidence, shall be conclusive. This type of review is normally used for determinations by such agencies as the Federal Power Commission and the Federal Trade Commission who, pursuant to the Administrative Procedure Act, have held

§ 11 of the Act, the savings clause, provides:

"Nothing herein contained shall be interpreted or construed as approving any act, action, or conduct which is or has been or may be in violation of existing law, nor shall anything herein contained constitute a defense to any action, suit, or proceeding pending or hereafter instituted on account of any prohibited antitrust or monopolistic act, action or conduct."[7]

From the foregoing it can be seen that many problems of statutory construction relating to jurisdiction exist in this case that have not been settled by the *Philadelphia Bank* decision, which decision was concerned with the Bank Merger Act and in no way considered the substantially different Bank Holding Company Act. These problems are made more difficult by the fact that § 11 of the Bank Holding Company Act did not appear in the original bills and § 9 of the Bank Holding Company Act, providing for judicial review in the appropriate Court of Appeals with a substantial evidence test applying to findings of the Board, was substantially different from earlier proposals for review pursuant to the Administrative Procedure Act with trial de novo provided. Because this court believed that the legislative history of the

Bank Holding Company Act might prove of some aid in the solution of these problems, it recently asked the parties to furnish material and comments relating thereto, more particularly, relating to § 9 and § 11.

The legislative history of the Bank Holding Company Act reveals without question that in acting in this area Congress was motivated by a concern over concentration in banking and a desire to control bank holding company expansion and prevent monopoly in this field. For example, in the Report of the Senate Committee on Banking and Currency on this legislation, Senate Report No. 1095, 84th Cong., 1st Session (1955) the following statements appear:

"In the opinion of your committee, public welfare requires the enactment of legislation providing Federal regulation of the growth of bank holding companies * * *." (Page 1)

" * * * It is not the committee's contention that bank holding companies are evil of themselves. However, because of the importance of the banking system to the national economy, adequate safeguards should be provided against undue concentration of control of banking activities. The dangers accompanying monopoly in this field are particularly undesirable in view of the

full public adversary hearings on a public record, with full opportunities to all parties to develop evidence as to rebut evidence produced by the others. No such procedures for the full development of a record are provided for by the Bank Merger Act or by any current proposal, and indeed there are important considerations that make the more summary handling of merger applications particularly appropriate. Since the vast majority of applications raise no serious problems of an antitrust nature, there would seem to be no little point in subjecting all merger applications before the regulatory authorities to all of the requirements of the Administrative Procedure Act in order to lay the groundwork for court review in those few instances where serious questions of competition are presented.
Consequently, while I am sympathetic to efforts to clarify through legislation

the application of antitrust law to banks, I believe that the current practice, whereby the Department of Justice institutes proceedings in Federal district courts against mergers which it believes to be unlawful, should be allowed to continue; so that there could be a trial de novo of all issues in any such suit."
This statement seems to us to clearly infer the Attorney General's belief that such a provision for review such as in the Bank Holding Company Act would abolish the duty of the Attorney General under § 15 of the Clayton Act to commence an action in district court concerning approved bank mergers and, consequently, the jurisdiction of the court to entertain such an action.

7. The Bank Merger Act of 1960 had no savings clause.

significant part played by banking in our present national economy. * * " (Page 1)

* * * * * *

"Testifying, before your committee for the Board of Governors of the Federal Reserve System, Chairman William McChesney Martin, Jr., stated:

'Existing provisions of law, originally enacted in the Banking Act of 1933, have proved entirely inadequate to deal with the special problems presented by bank holding companies. It has been, and still is, the Board's 'view that additional legislation is essential to deal effectively with these problems.'

Chairman Martin noted that the principal problems in the bank holding company field arise from two circumstances:

(1) The unrestricted ability of a bank holding company group to add to the number of its banking units, making possible the concentration of commercial bank facilities in a particular area under a single control and management; * * *. (Page 2)

* * * * * *

"Thus, under the bill, the growth of bank holding companies in the banking field would be regulated but not prohibited." (Page 2)

* * * * * *

"The committee is of the opinion that the bill now favorably reported to the Senate represents adequate and fair legislation to regulate the future expansion of bank holding companies * * *." (Page 4)

* * * * * *

"The factors required to be taken into consideration by the Federal Reserve Board under this bill also require contemplation of the prevention of undue concentration of control in the banking field to the detriment of public interest and the encouragement of competition in banking. It is the lack of any effective requirement of this nature in present Federal laws which has led your committee to the conviction that

legislation such as that contained in this bill is needed. Under its provisions, the expansion of bank holding companies in the banking field would not be prohibited, but would be regulated in the public interest." (Page 10)

* * * * *

"The provisions of this bill, in the opinion of your committee, provide adequate safeguards so that the maintenance or expansion of such bank holding companies can be regulated in the public interest." (Page 10) U.S. Code Congressional and Administrative News, p. 2482.

The House Committee Report, House of Representatives Report No. 609, 84th Cong., 1st Session (1955) contains the following statements:

"Your committee believes that the destruction of the American unit banking system, resulting in the further concentration of credit facilities, would have revolutionary effects upon our free-enterprise system. Ultimately, monopolistic control of credit could entirely remold our fundamental political and social institutions." (Page 2)

* * * * * *

"Your committee is convinced from the evidence presented during its recent hearings that this bill represents the minimum legislation necessary to deal with the bank holding company problem. The committee wishes to make clear that the legislation which it proposes is not designed to abolish bank holding companies or to prohibit the expansion, within certain limits, of existing bank holding companies. The bill would impose controls which the committee deems desirable over the creation and expansion of bank holding companies * * *." (Page 11)

"The bill would control the future expansion of bank holding companies. The problem of how far bank holding company systems should be permitted to expand has long been of serious concern. It is in this area that one of the greatest potential evils of bank holding

company operations exists." (Page 14)

Records of Committee and Subcommittee hearings on the legislation also reveal this Congressional concern and purpose. During the House Committee on Banking and Currency Hearings held on February 28, March 1, 2, 3, 4, 7, 8 and 9, 1955, William McChesney Martin, Jr., Chairman, Board of Governors, Federal Reserve System, stated:

"In the first place, there is nothing in present law which restricts the ability of a bank holding company to add to the number of its controlled banks. Consequently, there can well be situations in which a large part of the commercial banking facilities in a large area of the country may be concentrated under the management and control of a single corporation." (Pages 13–14)

and Representative Multer stated:

"Now what we are trying to do here now is to see what part, if any, of the antitrust laws, as they apply to banks, need correction or extension or revision. Isn't that the main purpose of this legislation? Isn't it into that field that we are actually delving?" (Page 111)

"The point I was making was this: This legislation we have before us now is part and parcel of the antitrust theory of legislation. If that principle is good, we have got to work it out here, too, and see that it is made to work in this field of our economy as it works in the other fields. That is the thing we have got to keep in mind when we try to put this bill in shape." (Page 117)

and Representative Spence, Chairman of the Committee, stated:

"So competition is one of the most essential things in the banking business, and I think it should be encouraged, and I think this bill will do that." (Page 128)

During the Senate Subcommittee Hearings of July 5, 6, 7, 11, 12 and 14, 1955, Chairman Martin stated:

"We believe, as we have said previously, that the principal problems in the bank holding company field arise from two circumstances:

(1) The unrestricted ability of a bank holding company group to add to the number of its banking units, thus making possible the concentration of commercial banking facilities in a particular area under a single control and management; * * *." (Page 44)

and in a written report on views of the Board of Governors of the Federal Reserve System added:

"(1) In the first place, there is nothing in present law which restricts the ability of a bank holding company to add to the number of its controlled banks. Consequently, there can well be situations in which a large part of the commercial banking facilities in a large area of the country may be concentrated under the management and control of a single corporation." (Page 75)

Floor debate in the House and Senate, appearing in Volume 101, Part 6 and Volume 102, Part 5 of the Congressional Record similarly disclose the intent of Congress, in enacting legislation dealing with bank holding companies, to prevent undue concentration or monopoly in banking. In Volume 101 at Page 8023, Representative Wolcott stated:

"Mr. Chairman, I think we should perhaps clear up, as far as we can, a little of the misunderstanding in respect to what the bill seeks to accomplish. In the bill there is the usual declaration of policy. It is the policy, as explained by the esteemed chairman of the committee, the gentleman from Kentucky [Mr. SPENCE] that the primary purposes of the bill are to control the expansion and creation of so-called bank holding companies and separate banking from the nonbanking activities. They go on to say, however, that it is generally to maintain competition among the banks and to minimize the danger inherent in the concentration of economic power through centralized control of banks."

Representative Rains stated at Page 8030:

> "But we did not harken to the soothing sirup of those who cautioned delay. We satisfied ourselves, after long and conscientious study of the facts, that the loopholes in our banking laws which permit—rather, which encourage—the alarming growth of monopoly and concentration of control in banking should be closed, and promptly so. Thus this bill. Thus this recommendation of the Committee on Banking and Currency to restore a greater measure of competition to banking, * * *."

> \* \* \* \* \* \*

> "Mergers and extension of holding company influence into our banking system across State lines give us a frightening picture of concentration in this most fundamental area of our economy."

Representative O'Hara stated at Page 8034:

> "It is the policy of the Congress in the enactment of the proposed legislation to maintain competition among banks. It also is the policy to prevent a concentration of economic power in the giving of credits. I take it that there is no disagreement there."

Representative Marshall stated at Page 8034:

> "By proper regulation and control of bank holding companies, the bill is intended to preserve the ideal of independent banking and prevent monopolistic centralization of credit."

Representative Brown stated at Pages 8037–8038:

> "Mr. Chairman, unless something is done to control bank holding companies, there probably would result increased monopolistic concentrations of power in the financial world. Such concentrations of power in any field long have been characterized by their strong inclination to bad practices.

> We have witnessed in this country monopolistic developments in various fields. Our policy has always been to discourage them because they are dia-

metrically opposed to our cherished system of free competitive private enterprise. This bill is designed to carry out this policy, and if it is necessary to amend the bill for such purpose, I hope no crippling amendments will be adopted. In a democratic way, we are merely urging rules for the game that will preserve our traditional freedoms. Monopoly in banking—the very lifeblood of all commerce—would bring in its wake vast political and financial influence. History has proven that the step from private monopoly to Government monopoly is short."

Representative Johnson stated at Page 8176:

> "Mr. Speaker, I wish to say a few words in support of H.R. 6227, the bill to provide for control and regulation of bank holding companies. I believe this legislation is essential to prevent a most dangerous type of monopoly, the banking monopoly. In my opinion, the bank holding company device leads to uncontrolled branch banking, resulting in an undesirable concentration of economic power. Unless restrictions, such as provided by H.R. 6227, are adopted, I think that the present system of independent, community banks will be endangered and ultimately banking will be in the hands of a few, with several superbank holding companies extending across the country.

> The old saying, 'An ounce of prevention is worth a pound of cure,' is very applicable to the banking situation. I believe it is in the public interest that we check a banking monopoly before it gains a firm foothold and thus help to preserve our traditional American system of independent competitive banking."

(See also statement of Representative Multer to the Antimonopoly Subcommittee of the House Judiciary Committee reprinted at Pages 8052–8057)

In Volume 102, Senator Robertson introduced a statement at Pages 6750–6751, containing the following:

> "S.2577, the bank holding company bill, which will be on the Senate Calendar

when Congress convenes in January, represents the culmination of 18 years of effort to control expansion of bank holding companies and to require such companies to divest themselves of nonbanking investments."

\* \* \* \* \* \*

"Our bill recognizes that bank holding companies are legitimate business organizations entitled to fair and equitable treatment, but that they should be subject to proper regulation by the Federal Reserve Board to prevent unfair competition and undue concentration of banking activities."

Senator Capehart stated at Page 6854:

"I favor 100 percent the purpose of the proposed legislation (period) I introduced proposed legislation on this subject about 3 years ago. The purpose of it is to prevent bank holding companies from expanding, except under controlled conditions. I think that is the best way to put it."

Senator Douglas stated at Page 6857:

"For here, as elsewhere, the control over credit is moving into fewer and fewer hands.

At the same time, industry has been moving out of competition into closer and closer concentration—monopoly and quasi-monopoly. This has been helped by the big banks. If we do not wish to travel the path of Canada, Great Britain, and Germany, we should do something effective to check and, if possible, to roll back the concentration of banking and credit. For he who controls the credit of a country controls the industry of that country and, ultimately, the political life of the Nation as well."

Senator Bricker stated at Page 6861:

"Under the bill, a bank holding company must obtain prior approval from the Federal Reserve Board before it can acquire a bank. The Federal Reserve Board in considering an application for an acquisition must take into consideration five factors. These factors are, first, the financial history and condition of the company or companies in the banks concerned; second, their prospects; third, character of their management; fourth, convenience, needs, and welfare of the communities in the area concerned; and, fifth, whether or not the effect of such acquisition would be to expand the size or extent of the bank holding company system involved beyond limits consistent with adequate and sound banking, the public interest, and the preservation of competition in the field of banking.

The last factor I named is the most important and requires the Federal Reserve Board to consider the question of the public interest and the preservation of competition in the field of banking. This provision gives the Federal Reserve Board power to prevent undue concentrations of banking activities and at the same time permits the strengthening and expansion of banking facilities when needed."

The foregoing excerpts, which are a few examples only and not an exhaustion of statements relating to the problem which the Bank Holding Company Act was designed to solve,[8] establish that the purpose of that legislation is in substantial part identical with that of § 7 of the Clayton Act. Despite this common purpose, the legislative history affords little enlightenment concerning Congressional intent as to the relationship of the two statutes or the effect of the Bank Holding Company Act upon § 7 of the Clayton Act and its enforcement provisions, § 11 and § 15.[9]

---

8. There is no reason in this discussion to cover other problems facing Congress, such as interests by bank holding companies in nonbanking companies, etc.

9. In considering this question it is well to remember that in 1955 and 1956, when the Bank Holding Company Act was being considered, no action involving bank holding companies had been commenced under § 15 by the Department of Justice to enforce § 7, and only one proceeding, the *Transamerica* case, supra, had been commenced under § 11, which

As some of the statements above quoted reveal, the existence of § 7 of the Clayton Act and its applicability to bank holding company acquisitions was, by some, virtually unrecognized.[10]

Other statements reveal that some believed the Federal Reserve Board alone had jurisdiction to enforce § 7. Thus, in an exhibit at Pages 27 and 28 of the House Committee Hearing, the following appears:

"That Congress intended to protect the American banking system against over-concentration and monopoly was made manifest when it passed the Clayton Act in 1914. In that act the Federal Reserve System was charged with responsibility for enforcing the prohibitions against stock acquisitions of banks whenever the effect might substantially lessen competition or tend to create a monopoly."

At Page 110, Representative Multer made this statement:

"Let me make this observation and then either you or Governor Robertson can pick it up from there: As I understand it, when the antitrust laws were written, the Congress took into account that banking was a very specialized part of our economy, and they have deliberately said that the Federal Reserve Board would have jurisdiction over all antitrust violations in the banking field. Isn't that so?"

And at Page 315 of the Senate Subcommittee Hearings, J. Cameron Thomson, President of Northwest Bancorporation, said:

"No holding company objects to control of acquisitions of bank holding companies if the test is based on sound banking considerations and the antitrust provisions of the Clayton Act, which, so far as banks are concerned, is the responsibility of the Federal Reserve Board."

Still other statements recognize § 7, but express dissatisfaction with the enforcement thereof. For example, at the Senate Subcommittee Hearings, Representative Multer stated:

"You will remember that there was written into the law provisions giving jurisdiction to the Federal Reserve Board to review those matters and take action with reference to any possible attempts to create a trust or monopoly in the banking field. There has not been a single recommendation all through the years by the Federal Reserve Board to the Attorney General for prosecution in that field. There has not been a single attempt all through the years by the Federal Reserve Board to do anything or, for that matter, by the Comptroller of the Currency to attempt to restrain expansion of banks. Not a single application for permission to merge or consolidate has been disapproved by either of them." (Page 361)

"Yes. I am of the opinion that the Federal Reserve Board entirely overlooked their duties as imposed upon them by the Clayton Act through the years until the clamor arose against bank mergers and bank consolidations as they are happening in the present era. I think they entirely overlooked the fact that they had the right to say 'There shall be no merger or no consolidation because of the provisions of the Clayton Act.' Their entire tendency as indicated by their constant approvals, their failure to stand up and say, 'No, this merger shan't go through, and that consolidation shan't go through,' indicates a sympathy for

proceeding resulted in a determination that a violation of § 7 had not been proved. Also, the recent Supreme Court decisions regarding the scope of § 7 were of course not available.

10. See also the statement of Governor Robertson at Page 112 of the House Committee Hearings:

"As was stated this morning, there are really two gaps in existing legislation. One is with respect to expansion. You have no control over it whatsoever. The other relates to combining of different businesses under the same roof. There is no control there. Those gaps should be covered and this legislation purports to do that."

the colossus, for the stupendous, in the banking industry." (Page 367)

"With reference to that specific matter, I think it is important to emphasize that with the strengthening of the antitrust laws so far as banks, bank stocks and bank acquisitions are concerned, and if our Federal agencies will now be alerted to their duty to step in and make sure that there are no violations of the antitrust law—and the whole history of it up to date shows that there has been no attempt to look at this situation up to the present moment so far as banks are concerned with any view as to whether or not they will be monopolistic or in violation of the antitrust laws—the minute we strengthen those laws and the minute our enforcement agencies begin to look into this situation of bank-stock acquisition and bank-asset acquisition and begin to bring to bear the full force of the antitrust laws, then bank holding companies must become the device to evade the law unless we enact a bill such as this. They can accomplish the identical thing through the bank holding company that you are seeking to prevent by regulating bank acquisitions and bankstock acquisitions." (Pages 368–369)

Others indicated that it was believed that § 7 lacked effectiveness in the area of bank holding company acquisitions. Thus during the Senate Sub-committee Hearings, the following colloquy took place at Page 316:

"SENATOR ROBERTSON. What is the largest bank holding company?

MR. THOMSON. Transamerica is still the largest. Marine Midland second.

SENATOR ROBERTSON. The Federal Reserve Board accused them of violating the antitrust laws.

MR. THOMSON. That is right.

SENATOR ROBERTSON. What was the outcome?

MR. THOMSON. In layman's language, they did not prove their case. But it did prove they did not have the right to bring action under the antitrust laws.

SENATOR ROBERTSON. Then, Tom McCabe, Chairman of the Federal Reserve, proceeded against the biggest one?

MR. THOMSON. That is correct.

SENATOR ROBERTSON. On the ground that it was violating the antitrust law? And did not prove the case?

MR. THOMSON. That is my understanding.

SENATOR ROBERTSON. Then you would assume from that that at the present time there is no bank holding company that could be successfully prosecuted as violating the antitrust laws of the Nation?

MR. THOMSON. Just as a layman, I would assume that, having started out on that course, if there are others, they would have brought action."

and during the House Committee Hearings, Harry J. Harding, President of the Independent Bankers Association of the 12th Federal Reserve District said at Page 187:

"Now, on all sides we see the signs of holding-company acquisitions, and a striving for a bigger and bigger share of the country's bank deposits. Does this sound like inertia, or is it the beginning of another mad scramble for banks, the aftermath of the Court's decision in the Transamerica case that the tool the Federal Reserve Board had leaned on, the Clayton Act, was no tool at all with which to combat a tendency toward monopoly?"

and during the House debates at Page 8033 of Volume 101 of the Congressional Record, Representative Rhodes stated:

"I wonder if the committee has considered that banks are subject to the Sherman Act and they are subject to the Clayton Act. I know there are some loopholes which now exist in the Clayton Act which make it impossible at the present time to treat as fully as they should be treated the monoplistic tendencies, if any there are, in the

banking business. But would not the better approach be to amend the Clayton Act and the Sherman Act, so that this tendency toward monopoly, if it exists, could be handled in the ordinary subjective way by the Attorney General of the United States and the United States attorneys, instead of having the Congress say, 'This is a situation which must by its very nature be monoplistic and, therefore, bad. We will make sure it does not happen any more?' I do not think that is the proper way to legislate on a subject such as this."

Another indication of Congressional intent regarding the relationship between the Bank Holding Company Act and the Clayton Act appears in Volume 102, Part 11 of the Congressional Record at Page 14346 when Senator Fulbright, discussing bank merger legislation considered the same year the Bank Holding Company Act was passed, by the same Congress, stated:

"In this connection, it should be noted that there was an unsuccessful attempt to enforce the stock acquisition provisions of section 7 against a bank holding company. The enactment of the Bank Holding Company Act of 1956 earlier this year provides effective regulation of all acquisitions by bank holding companies, and thus eliminates

the necessity of resorting to the Clayton Act in such cases."

and in Senate Report No. 2583, 84th Congress, 2nd Session (1956) on that merger legislation at Page 4, the following appears:

"As was stated previously, the attempt to enforce the stock acquisition provisions of section 7 against the Transamerica Corp. was unsuccessful. The Bank Holding Company Act by requiring advance approval by the Federal Reserve Board of all acquisitions by bank holding companies eliminates the necessity of resorting to section 7 in such cases. Thus, section 7 of the Clayton Act is actually an insignificant factor in the control of acquisitions by either banks or bank holding companies."

Our conclusions after studying the legislative history are as follows:

1. When it enacted the Bank Holding Company Act of 1956, Congress believed that the Clayton Act could not effectively cope with concentration in banking or with the danger to competition among banks which might result from bank holding company acquisitions.

2. It was the intent of Congress in enacting holding company legislation to strengthen, or activate, not repeal, § 7 of the Clayton Act.[11] To attain this result,

---

11. At Page 325 of the Senate Subcommittee Hearings Mr. Thomson stated:

"There may be another and more simple method of dealing with this question. Expansion of bank holding companies is primarily a question of competition and monopoly. Acquisitions by bank holding companies are subject to the Sherman Act and, as recently decided in the Transamerica litigation, to the Clayton Act insofar as stock acquisitions are concerned.

There are now pending in Congress S. 2075 introduced by Senator Sparkman and H.R. 5948 introduced by Mr. Celler which would complete the coverage by bringing asset acquisitions within section 7 of the Clayton Act. This problem might and perhaps should be dealt with directly as one of monopoly and competition. The indirect approach adopted by H.R. 6227 has resulted in a bill which will lead to confusion in the field of bank regulation, unneces-

sary conflict between State and Federal authorities, and *restrictions on normal growth far more severe than those of the antitrust laws*." (Emphasis ours)

and during the House Committee Hearings, R. M. Evans, former Governor of the Federal Reserve System, stated:

"During all the years that the Board was working with bank holding-company legislation, and all the years they were working with bank holding companies, we always had it in our minds that in the Clayton Antitrust Act we had some powers that could compel these people to observe the rules and regulations of the administrative body. It was only after we tried the case and submitted it to the courts, and the courts turned it down, that the question became really urgent, because as of today there is no regulation available, no regulating power available to the Board of Governors to stop the increase in bank holding

Congress chose to prohibit completely acquisitions by bank holding companies of a certain percentage of the voting shares of any bank unless prior approval was obtained from the Board of Governors of the Federal Reserve System, which Board was charged with the duty of enforcement of § 7 of the Clayton Act.[12] It instructed the Board to consider five factors in determining whether approval should be granted, each factor being a significant consideration in a § 7 case,[13] and, in order that all relevant competitive factors not specifically set forth could be considered, directed the Board in general terms to consider whether the effect of the acquisition would be to expand the bank holding company system involved beyond limits consistent with the preservation of competition in the field of banking.

3. Congress intended that the Board, while ruling on acquisition subject to the Bank Holding Company Act, simultaneously perform its duties under the Clayton Act and that the Board alone retain Clayton Act jurisdiction with respect to acquisitions subject to the Bank Holding Company Act.

We realize that this conclusion in effect repeals § 15 of the Clayton Act. We also realize, as stated in *Philadelphia Bank*, at pages 350–351 of 374 U.S., at pages 1734–1735 of 83 S.Ct. that

"Repeals of the antitrust laws by implication from a regulatory statute are

company acquisitions of independent banks.

Just to give you one little paragraph from the bank holding company hearings on S. 76 and S. 1118, we quote from the court's decision:

'We agree that this quantitative analysis—'

that is simply a statistical analysis to show the immense concentration of power in this Transamerica Corp.—

'we agree that this quantitative analysis discloses a tremendous concentration of banking capital and thereby of economic power in the hands of the Transamerica group, which may be unwise and against sound public policy. It may well be in the public interest to curb the growth of this banking colossus by appropriate legislative or administrative action. This, however, is not for us to decide. Our only question is whether the theory upon which the Board based its decision meets the legal tests which are required under section 7 of the Clayton Act, to determine whether Transamerica's bank stock acquisitions tend to create a mono*ply* of commercial banking. We are compelled to agree with Transamerica that they do not.'

So the court told the banking industry, and they told the Congress, that the Clayton Antitrust Act, under which these hearings were held, is not an adequate tool to accomplish the result that I have an idea Congress intended it should take care of in the basic legislation." (Page 507)

\* \* \* \* \*

"The worst part about the whole hearing was that when this law came up for a test in court it was found to be inadequate to do the job it was supposed to do. That is the great tragedy of the whole Transamerica hearing." (Page 508)

and the following colloquy took place (Pages 509–510):

"THE CHAIRMAN. You think the Clayton Antitrust Act is entirely inadequate to meet the situation, don't you? MR. EVANS. There is no longer the slightest question in my mind, Mr. Chairman. I was the hearing officer. I recommended the divestment of this whole thing. I thought the evidence was overwhelmingly that way and yet the court said that we did not have the authority to make our position stick. So the thing is inadequate and ineffective. THE CHAIRMAN. And if there is any regulation of holding companies, it ought to be written into the banking law which directly affects these institutions and governs their activity. MR. EVANS. Absolutely. I think it is basically wrong to permit any group of people to evade the law."

12. In this way, Congress could insure examination by an enforcement agency of the competitive effect of each acquisition. Until passage of the Bank Holding Company Act, despite the existence of the Clayton Act with its dual enforcement provisions, no such examination inevitably occurred. As stated previously, no action and only one proceeding involving bank holding companies had been commenced charging violation of § 7 of the Clayton Act.

13. See footnote 5, supra.

strongly disfavored, and have only been found in cases of plain repugnancy between the antitrust and regulatory provisions."

We wish to emphasize, therefore, that no repeal of the substantive provisions of § 7 is here intended and that in our opinion the Bank Holding Company Act effected a change only in the manner in which § 7 was to be enforced.[14] A holding that § 15 is repealed as to acquisitions subject to the Bank Holding Company Act is, in our opinion, compelled by the existence of plain repugnancies between the two provisions.

In urging that determinations by the Board on the propriety of acquisitions under the Bank Holding Company Act are distinct from or do not involve § 7 determinations, the plaintiff in effect asks us to rule that the Board, after performing its duty under the Bank Holding Company Act, considering the factors therein specified, and finding that an acquisition should be approved, has, in circumstances such as the plaintiff claims exist in the instant case, a duty under § 11 of the Clayton Act to challenge that same acquisition on the grounds that it is violative of § 7. Any construction of the statutes which would place the Board in that self-contradictory role would, in our opinion, be absurd.[15] Rather, we believe that Congress intended that when performing its function under the Bank Holding Company Act, the Board should simultaneously exercise its authority to enforce § 7, preventing before they occur acquisitions which would violate that section, and that the Board alone should have such enforcement powers.[16]

The nature of proceedings before the Board with respect to bank holding company acquisitions and of the review of Board orders provided by the Bank Holding Company Act also compels the conclusion that action taken by the Board with respect to a bank holding company acquisition and appellate review thereof was intended by Congress to be a final determination of the legality of that acquisition in all respects.

Admittedly, the hearing provisions of § 3 of the Act, quoted previously, are somewhat sparse. No hearing need be held if the Comptroller of Currency or State banking authority does not disapprove the application.[17] However, that such provisions are adequate to enable the

14. As footnote 22 on pages 344 and 345, on page 1731 of 83 S.Ct. of the *Philadelphia Bank* case reveals, repeal by implication of enforcement provisions of the antitrust laws is not unique. The Supreme Court there stated:

"Section 11 of the Clayton Act, 15 U.S.C. § 21, vests the FRB with authority to enforce § 7 'where applicable to banks.' This provision has been in the Act since it was first passed in 1914 and was not changed by the 1950 amendments. The Bank Merger Act of 1960, assigning roles in merger applications to the FDIC and the Comptroller of the Currency as well as to the FRB, plainly supplanted, we think, whatever authority the FRB may have acquired under § 11, by virtue of the amendment of § 7, to enforce § 7 against bank mergers. Since the Bank Merger Act applies only to mergers, consolidations, acquisitions of assets, and assumptions of liabilities but not to outright stock acquisitions, the FRB's authority under § 11 as it existed before the 1950 amendment of § 7 remains unaffected."

15. It might be argued, to remove this absurdity, that the Bank Holding Company Act repealed the Board's authority to enforce the Clayton Act by implication rather than repealing § 15. We believe it would be equally absurd to hold that Congress in directing the Board to examine proposed acquisitions in the light of the factors specified in the Bank Holding Company Act, intended to divest it of the authority and duty to enforce § 7.

16. In other words Congress abandoned the theretofore ineffective system of dual enforcement as to acquisitions covered by the Bank Holding Company Act in favor of required examination and enforcement by the Board prior to the acquisitions.

17. As a matter of practice, however, it appears that the Board does hold hearings even though no disapproval by the Comptroller or state banking authority is filed. See Whitney Nat. Bank in Jefferson Parrish v. Bank of New Orleans & Trust Co. (1964) 379 U.S. 411, at page 416, 85 S.Ct. 551, 13 L.Ed.2d 386.

Board to resolve the issues involved and make its determination is demonstrated by the following statement by the United States Supreme Court in the Whitney Bank case, at page 417, 85 S.Ct. at page 556:

> "Provision is made (under the Bank Holding Company Act) for a full administrative proceeding before the Board in which all interested persons may participate and the views of the interested supervisory authorities may be obtained."

See also, as to adequacy of Board proceedings, Northwest Bancorporation v. Board of Governors, etc., (C.A.8, 1962) 303 F.2d 832; First Wisconsin Bankshares Corp. v. Board of Governors (C.A. 7, 1963) 325 F.2d 946. And the plaintiff here has never pointed to any position it could not have enlarged and presented adequately before the Board.[18]

Likewise the plaintiff has never claimed that it did not have the right to seek review of the Board's orders under § 9 of the Bank Holding Company Act and clearly, where plaintiff's contentions are rejected by the Board, it must be considered a "party aggrieved" within the meaning of that section. Had it sought review, which it did not, the plaintiff would have had the burden of convincing the Court of Appeals that the Board's findings were not supported by substantial evidence or that its conclusions therefrom were erroneous. We find it repugnant to hold that Congress contemplated that the plaintiff could ignore this right of review completely, when its § 7 contentions unsuccessfully raised before the Board can be presented to the Court of Appeals, and commence an action in the district court. Particularly is this true since Congress rejected provisions permitting trial *de novo* in the Bank Holding Company Act in favor of the far more limited court review permitted under § 9.

18. In this case the plaintiff deliberately chose not to attack the defendant holding company's acquisition of stock of Marshall & Ilsley Bank and Northern. When the holding company sought approval of acquisition of the stock of Commerce, the Department of Justice filed statements

In the Court's opinion, the jurisdictional question here presented has been decided by the Supreme Court in the *Whitney Bank* case. In that case, the Supreme Court held that the district court had no jurisdiction to pass on the merits of a holding company proposal, and that original exclusive jurisdiction with respect thereto rested in the Federal Reserve Board. It stated:

"We believe Congress intended the statutory proceedings before the Board to be the sole means by which questions as to the organization or operation of a new bank by a bank holding company may be tested. *Admittedly the acquisition of an existing bank is exclusively within the jurisdiction of the Board.*" (page 419, 85 S.Ct. p. 557) (Emphasis ours)

\*    \*    \*    \*    \*    \*

" \* \* \* it is the exclusive function of the Board to act in such cases and contests must be pursued before it, not before the Comptroller. This position is also supported by legislative history which shows that Congress rejected a proposal for a *de novo* review in the distict courts of Board decisions on holding company proposals. Compare 12 U.S.C. § 1848 (1958 ed.) and S.Rep.No. 1095, pt. 1, 84th Cong., 1st Sess., 9, and pt. 2, 84th Cong., 2d Sess., 5, with § 9 of H.R. 6227, 101 Cong.Rec. 8187, and H.R.Rep. No. 609, 84th Cong., 1st Sess., 22, 25–26. Such a procedure would have been similar to that employed here against the Comptroller by respondents. However, the Congress decided otherwise, providing instead for review in the courts of appeals based on the facts found by the Board supported by substantial evidence. We think these congressional actions point clearly to the conclusion that it intended that *challenges to Board approval of the organization and*

with the Board opposing the acquisition and in a petition for reconsideration urged its position that the acquisition violated § 7 of the Clayton Act. The state banking authorities had recommended that the Board approve the acquisitions.

*operation of a new bank by a bank holding company be pursued solely as provided in the statute.* (Emphasis ours) This view is confirmed by our cases holding that where Congress has provided statutory review procedures designed to permit agency expertise to be brought to bear on particular problems, those procedures are to be exclusive. See, e. g., Callanan Road Improvement Co. v. United States, 345 U.S. 507 [73 S.Ct. 803, 97 L.Ed. 1206] (1953); Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41 [58 S.Ct. 459, 82 L.Ed. 638] (1938); Texas & Pac. R. Co. v. Abilene Cotton Oil Co., 204 U.S. 426, [27 S.Ct. 350, 51 L.Ed. 553] (1907). Congress has set out in the Bank Holding Company Act of 1956 a carefully planned and comprehensive method for challenging Board determinations. That action by Congress was designed to permit an agency, expert in banking matters, to explore and 'pass on the ramifications of a proposed bank holding company arrangement. To permit a district court to make the initial determination of a plan's propriety would substantially decrease the effectiveness of the statutory design." (379 U.S. pages 419–420, 85 S.Ct. page 557)

\* \* \* \* \* \*

"Moreover, we reject the notion that the Board's determination may be collaterally attacked in the District Court by a suit against the Comptroller. Opponents of the opening of a new bank by a bank holding company must first attack the arrangement before the Board, subject only to review by the Courts of Appeals. City of Tacoma v. Taxpayers of Tacoma, 357 U.S. 320, [78 S.Ct. 1209, 2 L.Ed.2d 1345] (1958); United States v. Corrick, 298 U.S. 435, [56 S.Ct. 829, 80 L.Ed. 1263] (1936). That Congress has not expressly provided that the statutory procedure is to be exclusive does not require a different conclusion. For Congress has expressly rejected proposed provisions for review in these cases in the district courts. Moreover it has en-

acted a specific statutory scheme for obtaining review, and where Congress has directed such a procedure as that found in the Bank Holding Company Act of 1956, the doctrine of exhaustion of administrative remedies comes into play and requires that the statutory mode of review be adhered to notwithstanding the absence of an express statutory command of exclusiveness.

A rejection of this doctrine here would result in unnecssary duplication and conflicting litigation. Some opponents might participate before the Board; others might well wait for termination of the Board's activities and then sue in the district courts for an injunction accomplishing the same ultimate end. The different records, applications of different standards and conflicting determinations that would surely result from such duplicative procedures all militate in favor of the conclusion that the statutory steps provided in the Act are exclusive." (379 U.S. pages 421–422, 85 S.Ct. page 558)

\* \* \* \* \* \*

"We have discussed earlier the importance which Congress has attached in the Bank Holding Company Act of 1956 to the principle that the Federal Reserve Board, with its expertise in the banking field, should make the initial determination of the propriety of the plan of organization giving full consideration to the legislative guidelines set out in the Act." (page 424 85 S.Ct. page 559.)

In a brief filed April 1, 1966, the plaintiff belittles the defendants for their reliance on the *Whitney Bank* case as follows:

"The repeated citation to the Court by the defense counsel in current and previous correspondence of the statement in Whitney National Bank v. Bank of New Orleans & Trust Co., et al, 379 U.S. 411, 414 [85 S.Ct. 551], to the effect that the Federal Reserve Board has 'original exclusive jurisdiction' under the Bank Holding Company Act is

peculiarly misplaced, and demonstrates manifest misunderstanding of the doctrine of 'primary jurisdiction.' In the first place, use of the statement in the *Whitney* case must be read in light of the fact that the particular litigation was not an antitrust one and involved no proceeding under any antitrust statutes." (Page 5)

and in a brief filed May 9, 1966, it attempts to distinguish that case and states:

"What the whole *Whitney Bank* dispute was really about, therefore, was the question of alleged illegality of the *de novo* bank under state anti-branch banking laws. It was not concerned with anti-trust in general, Section 11 in particular, or with any question of Section 9 versus Section 11. The various statements in the Supreme Court's decision, whether they be about primary jurisdiction, exhaustion of administrative remedies, appellate review or the like, must be regarded in light of this fundamental fact." (Pages 7–8)

The plaintiff's attempts to distinguish the *Whitney Bank* case are without merit. Contrary to plaintiff's statement, that case did not in our opinion involve any application of the doctrine of primary jurisdiction and defendants have demonstrated no misunderstanding of that doctrine. Rather, it dealt with the exclusive jurisdiction of the Board. We find nothing in the decision indicating that the fact that a new bank rather than an existing bank was being acquired was signif-

icant, particularly since the Court stated clearly that acquisition of an existing bank was exclusively within the Board's jurisdiction.

Neither do we consider the fact that the *Whitney Bank* case was not an antitrust action a relevant distinction. It is true that the savings clause of the Bank Holding Company Act, § 11, quoted previously, states that nothing contained in the Act shall constitute a defense in any suit arising out of any prohibited antitrust or monopolistic act, action or conduct. It also provides, however, that nothing contained in the Act shall be interpreted as approving any act, action or conduct in violation of existing law. Despite this latter mentioned provision of the savings clause, the Supreme Court held that the Board had exclusive jurisdiction to determine the legality of an acquisition which the Court of Appeals had held to be in violation of the Banking Act of 1933. We see no reason for giving the savings clause a greater effect when an antitrust violation is claimed than when violation of other existing law is alleged.

The savings clause upon which the plaintiff relies did not appear in bank holding company legislation as originally introduced in the House and Senate and there is little in the legislative history regarding its significance. In our view this section does not as the plaintiff claims reserve to it the right to challenge in a separate action acquisitions approved by the Board solely on the ground that the acquisitions violate § 7, and neither the Senate nor House Reports support that view.[19] This provision is entirely con-

19. With respect to that section, House Report No. 609 states at Page 34:
"*Section 12.* This section contains a savings clause to make clear that nothing in this act shall be construed as approving any act, action, or conduct in violation of existing law or constituting a defense in antitrust or monopolistic proceedings."
and Senate Report No. 1095 states at Page 19:
"The bill provides that none of its provisions are to be construed as approv-

ing any act, action or conduct in violation of existing law. It also provides that nothing in the bill shall constitute a defense to any action, suit, or proceeding pending or later instituted on account of any prohibited antitrust or monopolistic act, action or conduct. In the opinion of your committee, approvals granted and action permitted under the provisions of this bill are not to supersede the provisions of other Federal laws, particularly those designed to control monopoly or break up trusts.

sistent with our view that the Federal Reserve Board must consider § 7 in making its determination on applications under the Bank Holding Company Act and that the Board alone, subject to review, can enforce that section with respect to acquisitions subject to that Act.

The plaintiff had an opportunity to present its § 7 contentions before the Board when the acquisitions here involved were under consideration. It failed to object to the defendant holding company's acquisition of stock of Marshall & Ilsley Bank and Northern. When it chose to oppose the later acquisition of the stock of Commerce its position was considered by the Board and it was permitted to advance for consideration whatever material it desired. While it may be true that § 7 was not extensively discussed by the Board, the plaintiff's grievances in regard to its application should properly have been expressed to the Court of Appeals pursuant to § 9 of the Bank Holding Company Act and, for reasons heretofore stated, cannot be indirectly presented to this court.

In their answer the defendants challenged the jurisdiction of the court under § 15 of the Clayton Act. No jurisdictional defense was pressed, however, until after the trial had been completed. Since it must hold that it is without jurisdiction, the court believes a discussion of the merits would be improper. This is especially true since the Board having jurisdiction has rendered its decision.

Action dismissed.

For example, the Clayton Act has been judicially determined to apply to banks. Under the provisions of that act, the Federal Reserve Board has an administrative role to play in determining whether banks comply with the requirements of the Clayton Act. Under the

provisions of this bill, any action taken by the Federal Reserve Board in accordance with its terms is not to interfere in any manner with the performance by the Board of such functions as may be assigned to it under the Clayton Act."